IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Income Tax

| | | |
|---|---|---|
| CHRISTOPHER OSS, | ) | |
| | ) | |
| Plaintiff, | ) | TC-MD 190304N |
| | ) | |
| v. | ) | |
| | ) | |
| DEPARTMENT OF REVENUE, | ) | |
| State of Oregon, | ) | |
| | ) | |
| Defendant. | ) | **DECISION** |

Plaintiff appealed Defendant's Notice of Assessment, dated July 18, 2019, for the 2015

tax year.  A trial was held on January 22, 2020, in the courtroom of the Oregon Tax Court.  Judy

Mummert (Mummert), Enrolled Agent, appeared on behalf of Plaintiff.  Mummert and Mary

Anne Allen (Allen) testified on behalf of Plaintiff.[1]  Paul Vai appeared on behalf of Defendant.

Plaintiff's Exhibits 1 through 5 were admitted without objection.  Defendant's Exhibits A

through H were admitted without objection.

## I.  STATEMENT OF FACTS

During the 2015 tax year, Plaintiff ran a recreational marijuana business, Brown Pig LLC

dba Club Pitbull (Brown Pig), as a single-member limited liability company.  (Def's Exs F at 4,

A at 3.)  Prior to October of 2015, the business was licensed to provide medical marijuana, and

according to Allen's testimony, received the third recreational marijuana license issued in

Oregon.  Using the cash accounting method, Plaintiff reported the following items for Brown Pig

on his 2015 Schedule C: gross receipts of $1,153,466; cost of goods sold (COGS) of $1,100,217;

and a resulting gross income of $53,249.  (Def's Ex A at 3.)  During 2015, Plaintiff also had net

---

[1] Plaintiff's representative reported that Plaintiff was unavailable to testify in person following a trip to Vietnam for his wedding because of a "flu virus" in Asia.  Plaintiff did not request to appear telephonically.

income from farming in the amount of $12,046 and passive partnership income in the amount of $4,009. (*Id*. at 6, 7.) For both regulatory and personal reasons, Plaintiff's business and personal expenses are largely cash based. (Def's Ex F at 4.)

Following a review of Plaintiff's 2015 tax return, Defendant made several adjustments to Plaintiff's return, including disallowing $473,983 in COGS on his Schedule C. (*See* Def's Ex C at 2-5.) Upon consideration of Plaintiff's written objection, Defendant increased his COGS by $519,944 to $1,144,181. (Def's Ex E at 2.) In light of the "substantial amount of additional expenses" identified by Plaintiff, Defendant analyzed his gross receipts using an "indirect analysis" to better ensure the accuracy of his report. (*See id.*) Due to Plaintiff's reliance on cash, Defendant was unable to perform a traditional bank deposit analysis. (*See id.*) In addition to the $1,144,181 in purchases, Defendant found that Plaintiff substantiated $287,414 in nondeductible expenses, resulting in a total amount of $1,431,595 in outgoing cash. (*Id.*) That outgoing cash exceeded Plaintiff's reported gross receipts by $278,129, so Defendant increased Brown Pig's gross receipts by $278,129. (*Id.* at 2-3.)

A.    *Plaintiff's Indirect Income Analysis*

Mummert prepared an indirect income analysis on behalf of Plaintiff based on his income, gifts, and living expenses between 2009 and 2015. (Ptf's Ex 2.) Plaintiff asserts that the additional funds used to cover expenses were attributable to a combination of loans, gifts, and savings. (*See* Def's Ex F at 4.) Plaintiff claims that he received a start-up loan from his father, Ron Oss (Oss), in the amount of $120,000 on February 7, 2015. (Def's Ex D at 4.) Plaintiff claims that he received a total of $150,000 in gifts from his grandfather's estate between 2009 and 2015, gifted in increments of $25,000 per year. (Ptf's Ex 2; Def's Ex F at 4.) Finally, Plaintiff claims to have some savings from his prior years' income that was used to pay expenses

in 2015.  (*Id.*)

Mummert testified that the indirect income analysis only went back to 2009 because that was when Plaintiff began receiving the gifts that were used to finance his business in 2015.  She testified that his reported income of $10,508 in 2011 was derived from unemployment income and wages from Brown Pig.  (*See* Ptf's Ex 2.)  Mummert testified that his income for 2012 through 2014 was from Brown Pig and from his farming activities.  Plaintiff's annual income during those years ranged from $27,160 to $48,326.  (*Id.*)  Mummert testified that Plaintiff lived with his parents in 2009 and 2010, and possibly before that as well.  She testified that his cars were financed through MAPS credit union (MAPS), although she provided no documentation.

### 1.    *Loans*

During the audit process, Plaintiff provided a handwritten note documenting the loan from Oss, dated February 7, 2015.  (Def's Ex D at 4.)  Allen testified that she knows Oss and that he told her that he loaned the money to Plaintiff.  She further testified that Oss owns the building that Plaintiff leases for Brown Pig and that she knows that Oss was financially capable of providing such a loan to his son.  Plaintiff also provided four promissory notes from himself to Brown Pig.  (Def's Ex D at 1-3, 5-13.)  The promissory notes, each for $40,000 and totaling $160,000, were dated January 1, 2015, April 28, 2015, July 5, 2015, and October 21, 2015.  (*Id.*)

### 2.    *Gifts*

Plaintiff claims he received $25,000 in gifts from his grandfather's estate each year from 2009 to 2015, or $150,000 total.  (Ptf's Ex 2; Def's Ex F at 4.)  Plaintiff did not provide any records in support and no testimony was given regarding the gifts from his grandfather's estate.

### 3.    *Savings*

In her indirect income analysis, Mummert calculated that Plaintiff had $131,958 available

to him at the beginning of 2015.  (*See* Ptf's Ex 2.)  She calculated that figure based on Plaintiff's reported federal income, gifts, estimated living expenses, taxes, and auto expenses.  (*See id.*)  Mummert identified "280E expenses" for the 2015 year but not for any prior years.  (*See id.*)  Plaintiff asserts that his savings, when combined with the loan from his father, was sufficient to cover the excess expenses generated by Brown Pig in 2015.  (*Id.*)

Plaintiff provided a handwritten log from his safe purporting to show amounts removed from his cash savings during the 2015 tax year.  (Ptf's Ex 3.)  The log lists the amount and purpose of the withdrawal but does not contain any dates.  (*Id.*)  According to the safe log, the amounts transferred from his safe to his business totaled $344,700.  (Ptf's Ex 5.)  Allen testified that she was Plaintiff's bookkeeper starting in 2017 but that she recreated Plaintiff's books going back to 2014.  She testified that in 2015 Plaintiff had a business account with MAPS.  During 2015, MAPS charged marijuana businesses bank fees of $450 per month plus 1.75 percent on all cash deposits.  For that reason, Plaintiff minimized the amount of funds that were transferred to and from the bank account, using it primarily for payroll.  Allen testified that Plaintiff paid vendors in cash in 2015.

4.      *Living Expenses*

Plaintiff challenges Defendant's determination of his living expenses for the years 2009 through 2015.  (*See* Def's Ex G at 28 (using annual living expenses ranging from $53,220 to $59,217).)  Plaintiff calculated annual living expenses of around $25,000 per year for 2013 through 2015; $15,240 for 2012 and 2011; and $7,668 for 2009 and 2010 when he lived with his parents.  (Ptf's Ex 2.)  In support of his position, Plaintiff provided several IRS publications used to determine food, housing and utility expenses, and transportation expenses for purposes of calculating repayment of delinquent taxes for the 2013 and 2019 tax years.  (Ptf's Ex 4.)

The publications explicitly state that they are not to be used "in computing taxes or for any other tax administration purpose." (*See e.g.* Ptf's Ex 4 at 1, 2, 15.) They are based on national bankruptcy standards, U.S. census data and other large scale federal and local surveys. (*Id.*) The 2015 publication for "Food, Clothing and Other Items" lists allowable expenses for a household of one as $585 per month. (*Id.* at 1.) The Local Standards: Housing and Utilities lists expenses by household size for various counties in Oregon. (*Id.* at 4.) The 2013 publication shows allowable housing and utility expenses for a household of one in Marion County, Oregon at $1,477 per month. (*Id.*) The 2017 publication lists the same at $1,446 per month. (*Id.* at 6.) Plaintiff also provided similar publications listing allowable transportation expense tables. (*Id.* at 15-19.) The 2015 table lists allowable transportation costs for San Francisco at $522 for two cars. (*Id.* at 14.) The same table lists allowable transportation costs for Seattle at $438 for two cars. (*Id.*) It appears that Plaintiff averaged those two amounts to arrive at an auto expense of $480 for the relevant years.[2]

B.      *Defendant's Second Indirect Income Analysis*

Defendant performed a second indirect analysis for purposes of trial that was intended to demonstrate that—even assuming Plaintiff did receive a loan for $120,000 and inheritance gifts totaling $150,000—he did not have had enough cash savings to account for the excess expenses he incurred.[3]

Defendant used the Bureau of Labor cost of living index for 2014-15 to estimate Plaintiff's personal living expenses at $59,217, the average for the West region. (Def's Ex G at 1, 28.) That estimate was based on survey data showing the average West coast living expenses

---

[2] The table contains a handwritten note of "$480" next to the two amounts listed. (Ptf's Ex 4 at 18.)

[3] Defendant did not concede that Plaintiff received either the loan or gifts.

for a "consumer unit."[4] Defendant also provided DMV records showing that Plaintiff owned two cars, a 2013 Toyota Prius purchased in 2013 and a 2015 Mercedes 2CL purchased in 2015. (*Id.* at 5.) Defendant provided Kelley Blue Book estimates for the value of those vehicles and concluded that the Prius cost $28,950 and the Mercedes cost $48,300. (*Id.* at 10-13, 19-22.) Defendant included the full price of the vehicles in the analysis during the years of purchase. (*Id.* at 28.) Defendant's analysis used Plaintiff's reported income from 1998 to 2015, less federal and state taxes, estimated cost of living expenses, and the cost of the vehicles. (*Id.*) Defendant ultimately concluded that Plaintiff had $219,440 in expenses in 2015 that could not be accounted for, after factoring in the loans and gifts. (*Id.*)

Mummert testified that the differences between the parties' indirect income analyses are attributable to differences in the time span considered (Defendant's analysis spanned 1998 to 2015 whereas Plaintiff's spanned 2009 to 2015), living expenses (Plaintiff's analysis reports living expenses at half of what Defendant listed), and car payments (Defendant's analysis assumed that Plaintiff's cars were purchased outright rather than financed).

## II. ANALYSIS

The issue before the court is whether Defendant properly increased Plaintiff's gross receipts in the amount of $278,129 for the 2015 tax year.

The legislature intended to "[m]ake the Oregon personal income tax law identical in effect to the provisions of the Internal Revenue Code (IRC) relating to the measurement of taxable income of individuals" including "the definition of income * * * and other provisions relating to gross income as defined therein * * *." ORS 316.007.[5] Oregon generally adopts the

---

[4] The average number of people in a consumer unit was 2.6 with an average number of earners of 1.4. (Def's Ex G at 1.) The consumer unit includes 2.0 vehicles. (*Id.*)

[5] The court's references to the Oregon Revised Statutes are to 2013.

"administrative and judicial interpretations of the federal income tax law." ORS 316.032(2). "Gross income" is defined as "all income from whatever source derived * * *." IRC § 61(a). COGS is not a business expense deduction but rather a subtraction from gross receipts used to determine "gross income." *See* Treas Reg §§1.61-3(a); 1.162-1(a).

Taxpayers are required to keep adequate records such as are necessary to determine their correct tax liability. *See* IRC§ 6001; Treas Reg §1.6001–1(a). In the absence of adequate records, Defendant may reconstruct income using a method that clearly reflects income. *See Cebollero v. Comm'r*, 967 F2d 986, 989 (4th Cir 1992), *affg* TC Memo 1990–618 (approving use of "percentage markup method" for cash-based business); *Petzoldt v. Comm'r*, 92 TC 661, 687, 1989 WL 27845 (1989) (approving use of "cash expenditure method" to reconstruct income from drug smuggling business). Indirect methods may be used to reconstruct income, so long as they are reasonable in the circumstances. *See Holland v. United States*, 348 US 121, 126, 75 S Ct 127, 99 LEd 150 (1954) (approving use of "net worth method" despite the fact that taxpayer kept books for its business where evidence indicated unreported income); *Giddio v. Comm'r*, 54 TC 1530, 1532–1533, 1970 WL 2187 (1970) (approving use of Bureau of Labor Statistics figures to estimate taxpayer's cost of living where he had unreported gambling income).

Here, Defendant appeared to use the "source and application of funds method," also known as the "cash expenditures method"; that method "is based on the assumption that the amount by which a taxpayer's application of funds exceeds his reported sources of funds has, absent some explanation by the taxpayer, taxable origins." *Johnson v. Comm'r*, 41 TCM (CCH) 71 (1980); *see also Roundtree v. Comm'r*, TC Memo 1980-117, 1980 WL 3964 (1980). A taxpayer may rebut this assumption by showing that there was a nontaxable source of funds such as gifts, loans or savings. *Id*.

Plaintiff bears the burden of proof by a preponderance of the evidence. ORS 305.427. Preponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof * * *." *Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990). The court "has jurisdiction to determine the correct amount of deficiency, even if the amount so determined is greater or less than the amount of the assessment determined by the Department of Revenue, and even if determined upon grounds other or different from those asserted by the department * * *." ORS 305.575.

Plaintiff identifies four bases for overturning or modifying Defendant's adjustment to his gross receipts: 1) Plaintiff had nontaxable funds attributable to a loan from Oss in the amount of $120,000; 2) Plaintiff had nontaxable funds attributable to gifts and inheritance in the amount of $150,000; 3) Plaintiff had a nontaxable cash hoard as a source of funds; and 4) Plaintiff spent less for living expenses than determined by Defendant.

A.    *Loans*

Generally, without more, taxpayer's self-serving statement is insufficient to establish that a loan exists. *See generally Johnson*, 41 TCM (CCH) 71. The lack of records is particularly troubling where such records should be available but are not provided. *See Farah v. Comm'r*, 53 TCM (CCH) 1282 (1987) (court was unable to find loans existed where the testimony indicated that bank handled the transaction, but no bank records were provided). Although the same formality is not expected of a loan between family members, some independent evidence is necessary to corroborate the existence of the loan. *Pendino v. Comm'r*, 54 TCM (CCH) 482 (1987) (court found that taxpayer's testimony combined with evidence of bank transfer of funds

to taxpayer's parent was sufficient to establish that a loan existed).

Here, Plaintiff provided a handwritten note from his father memorializing the loan. Neither Plaintiff nor his father, Oss, were available to testify. The loan was made in cash, so no bank records exist to document it. Without credible testimony or third-party evidence to corroborate it, the court cannot conclude that Plaintiff received a nontaxable loan from Oss.

B.      *Gifts and Inheritance*

No testimony or other evidence was given documenting annual gifts of $25,000. Plaintiff claims that these gifts were from his grandfather's estate, who passed away in 2009. Plaintiff produced no records of gifts or inheritances. Usually when a person dies some records are produced, such as a death certificate, a will, a trust, or else their estate passes by intestate succession through the probate court. Having produced no evidence to support gifts or inheritance in any amount, the court is not persuaded that Plaintiff received $150,000 in gifts.

C.      *Savings, Indirect Income Analysis, and Cost of Living*

It is not enough to allege that a cash savings existed, the court must have some evidence to support the existence of a cash hoard. *See Johnson*, 41 TCM (CCH) 71 (court found taxpayer's testimony that he had a cash savings implausible given his yearly earnings and personal obligations). The court finds it plausible that Plaintiff maintained a cash hoard because he was working in a cash-based business. Plaintiff's indirect analysis shows that, going into 2015, he had approximately $130,000 in cash reserves attributable to savings from prior tax years. However, the court finds little evidence to support Plaintiff's contention that he had cash reserves in that amount from savings. In reviewing Plaintiff's analysis, the court notes that Mummert used federal gross income to establish incoming funds each year but neglected to subtract nondeductible business expenses ("280E expenses") for any tax years before 2015, even

though Plaintiff's income was derived from his marijuana business in 2011 through 2014. In using bankruptcy standards to estimate living expenses, the court finds that Mummert likely understated Plaintiff's annual living expenses.

In *Eschweiler v. Comm'r*, 58 TCM (CCH) 619 (1989), the court accepted respondent's living expense estimate based on U.S. Bureau of Labor Statistics for several mid-west cities where taxpayer was a Chicago resident and provided no evidence to support lesser living expenses. The court finds that Defendant's estimate of Plaintiff's living expenses is likely overstated given its use of statistics for the entire west coast and based on average household sizes rather than individuals. Plaintiff's living expenses, while not used for an appropriate purpose, are specific to Marion county and thus are more persuasive. As discussed above, even under Plaintiff's analysis, the court cannot find that Plaintiff had any cash savings.

### III.  CONCLUSION

Upon careful consideration, the court concludes that Plaintiff has not met his burden of proof that he received a loan from his father for $120,000 in 2015. The court is not persuaded that Plaintiff had any gifts from inheritance funds or cash savings. Accordingly, the court upholds Defendant's gross receipts adjustment of $278,129 in 2015. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.

_____

*If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of this Decision or this Decision cannot be changed.  TCR-MD 19 B.*

*This document was signed by Presiding Magistrate Allison R. Boomer and entered on July 30, 2020.*